Good morning. Mr. Maness, are you on the telephone? Yes. All right. And Mr. Bradley is present from the United States in the courtroom. So, Mr. Maness, if you're ready, we'll proceed to hear your argument. May it please the court. As Chief Judge Kosinski said in United States v. Gomez, this case gives fresh meaning to the phrase, We are from the government and we're here to help you. On the night of June 27, 2001, Brett Fletcher Maness, a resident of Alaska for nearly 40 years, was sleeping at his former home, a rural ranch and farm in the Matanuska Valley, near Wasilla. Later, he was brutally shot in the back. He has been in the worst prison this country has to offer ever since. He was a well-known musician and audio engineer whose former band, Hyperthermia, was a best-selling Alaskan band throughout the late 80s and 90s. He raised his own food at the ranch and owned a business called Maverick Supply that specialized in collectible military and outdoor optics. On this eventful night, Mr. Maness' six-month-old Great Dane, Shotzi, awakened him after midnight because she urgently wanted to go outside. When letting her out, he noticed that the door to his Winnebago motorhome was ajar. Inspection revealed that three of his firearms were conspicuously placed therein. Although Mr. Maness was on his own property, minding his own business, and it was not even alleged that he had committed or was about to commit any crime whatsoever, a heavily armed squad of Alaska State Troopers found it necessary to sneak onto his homestead at approximately 1 a.m. that morning. They parked their police vehicles in a concealed position so as not to be identified, then proceeded in a, quote, stealth approach, unquote, on foot. They had no warrant, yet without warning, they attempted to force entry through door and windows. It was dark outside at 1 a.m., and Mr. Maness could not identify the squad that he perceived to be unenlightened trespassers. A tape recording of the incident shows that they did not identify themselves. He saw armed men attempting to break in, one aiming a gun at him through the door's window. When he confronted the unidentifiable armed squad of sneaks, trespassers, and housebreakers, by providing them with fair warning, the tape shows that they responded by demanding that he exit the safety of his home. The reason provided was, quote, we want to talk to you about your health, unquote. In fear of life and limb, he more emphatically warned the trespassers to immediately depart his curtilage. They then ran away. He seized this opportunity to depart in his Winnebago. He was having mechanical problems and slightly backfired as he drove away. Trooper Spitzer falsely reported over police radio, quote, I'm taking shots, shots fired, my vehicle's been hit. I repeat, shots fired at my vehicle, unquote. He kept repeating, quote, another shot fired, unquote. Then reported a, quote, light flash from the right rear side of the vehicle. It might be exhaust backfire or it might be something rigged up in the rear of the vehicle, unquote. Actually speculating over police radio that Mr. Maness had a firearm rigged to fire backwards like something on a Batmobile. He later inspected his vehicle, confirmed that it had no damage and thus could not have been hit by gunfire, but did nothing to correct his mistake and allowed all police in Alaska to believe the false shots fired report. This caused a hysterical overreaction. Multiple police agencies tailed the motorhome from a great distance, but did not pull it over due to fear of gunfire. Spike strips were deployed to disable it. Mr. Maness pulled over and exited, unarmed, hands raised. He could see 20 to 30 police cars coming to a stop 500 yards back. They looked something like keystone cops running around chaotically and screaming at each other. They are now pulling out M16s, shotguns, and .30 caliber sniper rifles. Only one police car, driven by Trooper Kevin Yancey, started down the highway. Instead of stopping, he sped right past. Shortly after, the police opened fire without warning. Mr. Maness was forced to retrieve a rifle and self-defense and flee for his life to the Wooded Mountains. He had to swim across the swamp and abandon his puppy, Shotzi, because she had not yet learned to swim. He could not put into words how hard it was to have to abandon his dog, who was scared and just did not understand why they were being shot at. A massive manhunt ensued. The next morning, Mr. Maness was shot in the back with a bear slug fired from a 12-gauge shotgun. He was very fortunate to survive. Later, he discovered this fiasco was created in response to a spurned, vindictive, and vexatious ex-girlfriend's false allegations and an application for civil commitment that Mr. Maness had, quote, a brain tumor and thought he was a witness from Revelations or Jesus Christ, unquote. Before sending police to Mr. Maness' property, she had planted the firearms in his motorhome. His firearms had been under her control and stored in another location because he was on bond pending appeal of his only felony conviction, simple possession of marijuana. Her sinister plan was to have Mr. Maness shot by police, and if he survived, to land him in prison. She took possession of various property that she had spent the previous year clandestinely putting it under her name. Indeed, she claimed this very rifle as her property and attempted to retrieve it from police. Twenty-one months later, Mr. Maness was indicted by the federal government for possession of the rifle. His defense for this charge was that he was framed up by his ex-girlfriend, who had planted firearms and then sent police onto his property. His frame-up defense was to be combined with a justification defense that would apply the moment he was forced by the aforementioned unreasonable actions of the police to take up arms in self-defense. He was convicted after the district court precluded him from presenting the proposed justification defense to the jury. In order to sentence Mr. Maness to the statutory maximum, the district judge made findings of guilt for six enhancements. At least two of these were clearly erroneous. The government does not even contest that the obstruction of justice enhancement, applied for alleged perjury on the stand, was erroneous. One enhancement was applied for the alleged possession of an assault weapon that is clearly not an assault weapon under the law. The government made conclusory allegations that the rifle is described by 18 U.S.C. section 921-830 but presented no evidence that it was. In five of these enhancements, the district judge entered virtual convictions for serious crimes other than the offense of conviction. It is submitted that entering judge-found virtual convictions into the record violates the defense-right to jury trial in due process because the guideline scheme allows these to have adverse legal consequences. No court has ever addressed the precise Fifth and Sixth Amendment issue before this court today. It does not concern the district court's discretion to hand down any sentence up to the statutory maximum. The issue is analogous to multiplicitous jury-found convictions. It is black-letter law that these must be vacated because of potential collateral consequences even when they have no effect on the length of sentence. As far as the real outcome is concerned, the consequence suffered by Mr. Mannis, namely, the loss of his right to jury trial in a civil case, is the same as if he had been found guilty by a jury of 12 beyond a reasonable doubt instead of by one judge using a much lower standard of proof. In other words, a district judge may consider any alleged facts when fashioning a sentence, but when virtual convictions for serious crimes are entered into a record and these have potential adverse consequences above and beyond the statutory maximum penalty for the crime of conviction, this implicates Fifth and Sixth Amendment concerns. Mr. Mannis, this is Judge Fisher. Your time is running down. I had a question about the gun. Would you mind if I ask that? No, sir. The Norinco gun was in the courtroom, was it not? Yes, sir. Okay, and I understand you to say that it doesn't qualify in part because they were shipped after a certain date, they had non-folding stocks, and yet the transcript seems to indicate that the gun in the court, the agent who is testifying, folded the stock down. Is that incorrect? Well, the stock would fold to the side, not down. I see. The stock was pinned, and that's how it was legally imported. I see. Okay, thank you. Yes. Okay, I'll carry on. Pursuant to A.T.U.S.C. Section 3553.A.2.A., this reviewing court should consider whether this sentence promotes respect for the law. Jurors and the general public cannot respect an interpretation of the Fifth and Sixth Amendments that allow collateral consequences, extra punishment, and greater stigma based on judge-found verdicts for serious crimes labeled as sentencing factors. The time has come for courts to get modern jurors' prudence in line with the traditional common law rule of the jury. The public's perception that the currently prevailing law does not respect jurors' contributions to the criminal justice process. If I could reserve the remainder of my time. All right, thank you, Mr. Maness. Mr. Bradley? May it please the Court. Thomas Craig Bradley on behalf of the United States, an assistant U.S. attorney from the District of Alaska. I tried this case below. Mr. Maness talks about 3553, and that's what I want to begin talking about because I think it's the most significant to the first issue in the case, the nature of the remand or the need for any resentencing in this case. Judge Kleinfeld, on behalf of the District of Alaska, the last time a panel of this circuit heard this case, referred to the defendant as a desperado. Judge Beislein, at sentencing, said, Mr. Maness, you're a dangerous man. You need to change your ways. He, although he never completely analyzed the guidelines, which were seen as mandatory at that time, there was really no need to because, at the time, they were so much higher than the maximum sentence in this case. Even after the Ammaline remand, Judge Beislein, although he initially bought Mr. Maness's argument about the nature of the weapon, he, on further reflection, realized that he was looking at the wrong subsection and reiterated that you're a maximum-type defendant. Your Honors, we don't see maximum sentences in very many cases. We all know what the maximum penalties are. We have to get up and read them at the initial appearance of defendants. The press releases and newspapers always say the defendant could face up to 120 years in prison on multiple counts, but almost no one ever gets that. Mr. Maness got that because the first factors in 3553, the nature of the crime and the nature of the criminal, weigh strongly against him in this case. This was not a case where a hunter had a rifle in his closet or someone had a pistol in the backseat of their car that they weren't supposed to have because they had a prior conviction. This was the worst possible use of firearms that can almost be imagined that comes across this court's desk. He armed himself, and he told the same story to the jury. It resulted in the obstruction enhancement for perjury. They didn't believe it either, that he was simply home alone when some unknown people planted guns. He went out to his motorhome. He saw firearms. Oh, my goodness, guns. I'd better take them somewhere and get rid of them because I can't have guns. I'm a convicted felon. All of a sudden, the troopers come out of the mist. But he doesn't know and testifies. He doesn't know that they're the troopers, even though they're wearing uniforms and Stetsons and they're 6'4", 6'5", and telling him, Mr. Maness, we need to take you to the hospital. He says, you're not taking me anywhere. It ain't going to be easy. I'm not going back to nigger land, which is what he was referring to as jail. Mr. Maness's history was a history of violence. He had a conviction for marijuana grow. However, there were circumstances around it involving the killing of a neighbor, a black neighbor who was shot in the back of the head. He was acquitted on self-defense grounds by an Alaska jury. But, again, those are the kind of factors under 3553, the nature of the offender, that don't work in his favor in this case. He led the troopers on essentially a low-speed trace. He was driving a motorhome, not a sports car. They did have to spike strip his tires. He armed himself with bandoliers of ammunition, an automatic assault, semi-automatic assault rifle, and ran off into the woods like Rambo. He hid for hours, was confronted by law enforcement officers, and finally was shot when he spun around and pointed the assault rifle at a member of the Anchorage Police Department who shot him in the shoulder with a 12-gauge shotgun. And, yes, he is very lucky to be alive. Mr. Maness deserved a maximum sentence, probably deserved more than the maximum, and Judge Beislein made it very clear, I'm giving you the maximum sentence in this case. You deserve the maximum sentence. He's argued that this was not an assault weapon. It clearly was. It had a pistol grip. It had a folding stock. The United States doesn't know when it was imported. We know certainly that it was sold in 1993, not to Mr. Maness. We know that Mr. Maness couldn't have any type of weapon. And we know that when the Guidelines Commission was interpreting and incorporating the assault weapons ban, it appears that they specifically referred to Section V3 of 922, not Section V2, which is the sort of grandfather clause. And there was, of course, much legislation and much lobbying about the nature of the assault weapons ban. And there was a grandfathering in for people who had lawfully owned weapons of that type that had been imported previously. And that was a very, very simple and detailed discussion and decision by the Sentencing Commission. Here we have a very good description of what the dangerous weapons are. He wasn't prosecuted for importing or distributing those weapons when the grandfather clause would come in. He was prosecuting for having one. And this was a more dangerous weapon as recognized by Congress and as recognized by the Sentencing Commission, even though that statute has sunsetted. That's still the description of the dangerous weapons because this was an assault weapon. The ATF expert did fold the stock up against the weapon to describe that and to show that to the jury. Mr. Maness said that it was pinned. Can you explain that? There is a pin that adjusts it. You can squeeze the pin and fold the stock then up against the rest of the weapon and give you more of what the officer described as an assault carry. You can carry it down at your hip. You can tuck it into your hip, holding the pistol grip, and then fire from the hip. You can also squeeze the pin, pull the stock back out, and hold it up at your shoulder and have a much more stable firing platform. That weapon was capable of doing both. Perhaps some weapons have been modified so that the stock will not work. This was not one of them because that was done in front of the jury. I held the weapon up to the jury in closing argument and showed it to them. I thought about bringing it down here and thought better of it. But it was clear that Judge Beislein saw that weapon. He examined it. He knew what kind of weapon it was. And he imposed the base offense level of 20 rather than 14 because of the nature of the weapon itself and because of the danger that that weapon provided. And I would submit that even if, under the advisory guidelines, that provision wouldn't apply, it would still apply under 3553. This kind of weapon is far more dangerous than a small pistol, which he had in his pocket, a hunting rifle, which he had in his motorhome. He was prohibited from having any kind of weapon, and yet the weapon that he had made him very capable of killing police officers, resisting arrest. And it's almost a miracle in this case that no one was injured besides Mr. Maness, and it's a miracle that he didn't die as a result of his actions in this case. But he hasn't sustained any prejudice. Judge Beislein listened to everything that he submitted. He read the pro se documents that were submitted, even when Mr. McCoy from the Federal Defender's Office was representing Mr. Maness on appeal. Even after the Hamline remand, he reconsidered and decided he was not going to have a resentencing because, he said, I would have given him the maximum sentence anyway. There would be no reason to reassign this. There's no reason to send it back for any type of resentencing. Again, this is one of the few defendants that we will see who really does deserve the maximum penalty that can be imposed by the court, and Judge Beislein recognized that and he imposed it. I'd be happy to answer any other questions that Your Honors may have. I don't think so. Thank you, Mr. Bradley. Mr. Maness will hear from you for a minute. Well, I think that the place to dispute whether the rifle qualifies under 18 U.S.C. 921-830 is an evidentiary in the lower court. I will say that when I owned the rifle, the stock would not fold because it was permanently tinned, as it needed to be to be approved for importation by the ATS. I would like to add that, as recently clarified by this court, a possession of a firearm requires an intent to control it, and this bolsters my ineffective assistance claim. This claim should be addressed on direct appeal because it will essentially be moot by the time it can be raised in a Section 2255 motion. For the same reason, this court should consider granting the unopposed motion for relief pursuant to Circuit Rule 2712, which allows relief before an appeal becomes moot. Only 13 months remain before Mr. Maness will have served a statutory maximum sentence. Additional issues that were not addressed here because of time constraints are fully argued in the briefs. Thank you, judges. Thank you, Mr. Maness. Thank you, Mr. Bradley. The matter just argued will be submitted, and the court will stand in recess for the day.
judges: Hawkins, Rawlinson, Smith